IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANA FONGSUE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  20-574 |
| Social Security | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                               September 30, 2020

Diana Fongsue ("Plaintiff") seeks review of the Commissioner's decision denying

her application for disability insurance benefits ("DIB").  For the reasons that follow, I

conclude that the decision of the Administrative Law Judge ("ALJ") denying benefits is

not supported by substantial evidence and will remand the case for further proceedings

pursuant to sentence four of 42 U.S.C. § 405(g).

### I.     PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on May 12, 2017, alleging that her disability

began on July 20, 2013, as a result of a combination of diabetes, neuropathy, high

cholesterol, and high blood pressure.  Tr. at 84, 174, 211.[1]  Plaintiff's application for

benefits was denied initially, id. at 90-93, and Plaintiff requested a hearing before an

---

[1]For DIB eligibility, a claimant must establish disability on or before her date last insured ("DLI").  See 20 C.F.R. § 404.101(a); Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).  Plaintiff's DLI is December 31, 2016.  Tr. at 198.  Thus, she must establish that she became disabled on or before December 31, 2016 to establish entitlement to DIB.

Plaintiff previously filed for and was denied DIB.  Tr. at 199.  The most recent application was denied by an ALJ on July 19, 2013.  Id. at 66-75, 199; Doc. 14 at 2 n.2; Doc. 15 at 2 n.1.  Although Plaintiff filed a request for review of that decision with the Appeals Council, the appeal was dismissed as untimely filed.  Id. at 81.

ALJ, id. at 95, which took place on October 18, 2018.  Id. at 32-62.  On January 28, 2019,

the ALJ found that Plaintiff was not disabled.  Id. at 12-24.  The Appeals Council denied

Plaintiff's request for review on December 5, 2019, id. at 1-3, making the ALJ's January

28, 2019 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on February 3, 2020, Doc. 2, and

the matter is now fully briefed and ripe for review.  Docs. 14, 15.[2]

## II.   LEGAL STANDARD

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.     Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.     If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.     If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.     If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe

---

[2]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 8.

impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled and is capable of performing work that exists in significant numbers in the national economy.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

### III.    DISCUSSION

### A.    ALJ's Findings and Plaintiff's Claims

At the second step of the sequential evaluation, the ALJ found that Plaintiff suffered from several severe impairments; degenerative changes of the lumbar spine, lumbar radiculopathy, pain disorder associated with psychological factors, and major depressive disorder ("MDD") without psychosis.[3] Tr. at 14.  The ALJ found that Plaintiff did not have an impairment or combination of impairments that met the Listings, id. at 15, and that through her date last insured, Plaintiff retained the RFC to perform light work with limitations to occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling, with no climbing of ladders, ropes or scaffolds.  Id. at 17.  In addition, the ALJ found Plaintiff could tolerate occasional exposure to humidity, wetness, machinery, and extreme temperatures with no exposure to unprotected heights, and she was limited to the performance of simple and routine tasks with simple work-related decisions and no more than occasional contact with the public, supervisors, and co-workers.  Id.  The ALJ determined that Plaintiff was unable to perform her past relevant work, but relying on the testimony of a Vocational Expert ("VE"), she found Plaintiff could perform the jobs of marker, garment sorter, or checker.  Id. at 22-23.

Plaintiff claims that the ALJ's determination that her lumbar spine disorder does not meet Listing 1.04A is not supported by substantial evidence and that the ALJ failed to provide an adequate explanation with respect to the Listing determination.  Doc. 14.

---

[3]Plaintiff's conditions will be defined as necessary in the discussion of her claims.

Defendant responds that substantial evidence supports the ALJ's Listing determination.
Doc. 15.

### B.     Plaintiff's Claimed Limitations

Plaintiff was born on February 17, 1971, making her 42 years old on her alleged
onset date, and 47 years old at the time of the ALJ's decision. Tr. at 174.  She completed
high school and one or two years of college, and has prior work as a nursing assistant in a
nursing home. Id. at 40, 212.  At the time of the administrative hearing, she lived with
her husband and their twenty-year old daughter. Id. at 39.

At the administrative hearing, Plaintiff explained that she could not return to her
prior work because it was too strenuous in view of how much time she spent lifting,
sitting, and walking. Tr. at 43.  When the ALJ asked her about performing a generic job
that required lifting only twenty pounds, Plaintiff said that she was not sure because she
had difficulty sitting or standing for long periods and had trouble with her memory. Id. at
44-45.  Plaintiff testified that she spends most days in bed because her hip, legs, and back
hurt, but if she is feeling okay she will do activities such as laundry. Id. at 45.  She said
that the pain makes it difficult to sleep. Id. at 46.

Plaintiff explained that she has pain in her lower back that travels up the center of
her back, through her legs, and down to her toes. Tr. at 49.  The pain is exacerbated by
long-term sitting. Id. at 49-50.  Plaintiff also testified that she loses feeling in her leg,
which has caused her to fall in the past. Id. at 53.  Additionally, she sometimes feels
dizzy and her depression causes her to cry a lot. Id. at 54-55.  She does not believe she

would be able to work because she could not sit and stand for eight hours a day or focus. Id. at 55.

Plaintiff estimated that she can sit for twenty minutes at a time, stand for ten to fifteen minutes, walk for fifteen minutes, and lift twenty pounds.  Id. at 50.  She testified that her pain medications made her drowsy.  Id. at 51-52.  Although Plaintiff had a spinal cord stimulator implanted, she said that "[i]t just did not work."  Id. at 52.  Similarly, Plaintiff testified that the injections she underwent "did not work at all."  Id. at 53.

With respect to chores, Plaintiff said she "can do a little dishes," two loads of laundry on a good day, and her husband does cleaning up around the house and most of the shopping.  Tr. at 54-55.

### C.   Summary of Medical Record

The claim Plaintiff presents in her brief focuses on the ALJ's determination that she did not meet Listing 1.04 – Disorders of the Spine.  Doc. 14 at 4-9.  Therefore, I summarize the entire medical record with emphasis on the treatment Plaintiff received for her back and radiating pain, and will discuss that treatment in depth as necessary in my discussion of Plaintiff's claim.  The treatment records continue beyond Plaintiff's date late insured at the end of 2016.

Plaintiff has a history of lower back pain, pain in her left hip, and pain and numbness in her left leg for which she treated with Greater Philadelphia Spine and Pain ("GPSP").  Tr. at 390.  She was diagnosed with lumbar radiculitis,[4] lumbar disc

---

[4]Radiculitis is the inflammation of the root of a spinal nerve.  Dorland's Illustrated Medical Dictionary, 31st ed. (2007) ("DIMD") at 1595.  Radiculopathy is the term used to describe the symptoms caused when the nerve roots become pinched or damaged.  See

displacement, lumbar disc degeneration, lumbar facet disease, sacroiliitis,[5] and chronic

pain syndrome.  Id. at 392.  In May 2013, just prior to Plaintiff's alleged disability onset

date, she was prescribed ibuprofen, gabapentin, Percocet, Lidoderm patches, and MS

Contin.[6]  Id. at 390.  Shailen Jalali, M.D., noted that Plaintiff had normal strength in her

upper and lower extremities, positive straight leg-raising and Patrick tests on the left

side,[7] and tenderness and muscle spasms in her lower back.  Id. at 391.

---

https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last
visited Sept. 30, 2020).

[5]Sacroiliitis refers to inflammation of one or both of the sacroiliac joints located
where the lower spine and pelvis connect, causing pain in the buttocks or lower back,
which can extend down one or both legs.  See
https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last
visited Sept. 30, 2020).

[6]Gabapentin is an anticonvulsant also used to treat neuropathic pain.  See
https://www.drugs.com/gabapentin.html (last visited Sept. 9, 2020).  Percocet contains
oxycodone, an opioid pain medication, and acetaminophen, a less potent pain reliever
that intensifies the effects of oxycodone.  See https://www.drugs.com/percocet.html (last
visited Sept. 9, 2020).  Lidoderm is painkiller used to treat nerve pain and long-term pain
problems.  See https://www.drugs.com/cdi/lidoderm.html (last visited Sept. 9, 2020).  MS
Contin (generic morphine) is an extended release opioid medication used to treat
moderate to severe pain.  See https://www.drugs.com/ms_contin.html (last visited Sept.
9, 2020).

[7]The Lasegue test, also known as the straight leg-raising test, checks for
impingement of the nerves in the lower back by determining whether there is pain when
"the symptomatic leg is lifted with the knee fully extended; pain in the lower extremity
between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the
distribution of the pain indicating the nerve root involved."  DIMD at 1900, 1006.
The Patrick test, also known as the Fabere sign, is used to determine the presence
of arthritis of the hip.  "[W]ith the patient supine, the thigh and knee are flexed and the
external malleolus is placed over the patella of the opposite leg; the knee is depressed,
and if pain is produced, arthritis of the hip is indicated."  DIMD at 753.

Plaintiff underwent implantation of a spinal cord stimulator on June 24, 2013.  Tr. at 393, 465, 468.  Two weeks later Plaintiff reported a slight decrease in pain.  Id. at 393. However, in the following months, Dr. Jalali reprogrammed the stimulator based on Plaintiff's complaints of pain.  Id. at 398, 401, 404, 407, 411.  Plaintiff began complaining of increased pain and pain radiating down her left leg in March 2014.  Id. at 412.  She underwent a series of injections that provided only mild temporary relief.  Id. at 466, 469 (left L5-S1 transforaminal epidural steroid injection on 3/24/14), 419, 467, 470 (left L5-S1 transforaminal epidural steroid injection on 5/19/14), 429, 471 (bilateral sacroiliac joint injection on 9/22/14), 437 (no improvement with sacroiliac injection 1/5/15), 440 (facet injections on 1/12/15 provided five days' relief).  Additionally, because Plaintiff had no benefit from the spinal cord stimulator, she discontinued its use and planned to have it removed in early 2015.  Id. at 430.  The last record of Plaintiff's treatment at GPSP was on October 30, 2015.[8]  Id. at 462.

Plaintiff received pain management assessment and treatment from Grossinger Neuropain Specialists.  Bruce H. Grossinger, D.O., performed EMG studies on July 20, 2016, which revealed "moderate, left S1 radiculopathy, as well as mild left L4 radiculopathy."  Tr. at 729-30.  An MRI performed on August 11, 2016, showed mild disc dessication at L5-S1, and also a central disc herniation at L5-S1 "touching but not

---

[8]At that point, Peter Meyer, M.D., Plaintiff's psychiatrist, began prescribing Plaintiff the regimen of medications she had been prescribed at GPSP, including morphine sulfate, lidocaine, oxycodone, and gabapentin.  Tr. at 603.  Dr. Meyer indicated that her pain management doctor abandoned the practice, id., but Plaintiff's counsel indicates that the practice ceased accepting Plaintiff's insurance.  Doc. 14 at 3.

compressing the anterior aspect of the thecal sac." Id. at 734-35.  Dr. Grossinger's

colleague Jason Brajer, M.D., proceeded to treat Plaintiff with several series of injections

for the treatment of her back and radiating pain.  Id. at 731 (8/1/16), 736 (9/6/16), 739

(10/4/16), 744 (11/7/16),[9] 747 (12/13/16), 751 (1/3/17), 755 (3/17/17), 759 (4/17/17), 763

(5/5/17).  Dr. Brajer noted that Plaintiff's primary care physician had been prescribing

narcotics (morphine and oxycodone), but that Plaintiff stopped taking them in January

2017.  Id. at 760.  Dr. Brajer prescribed Butrans patch, gabapentin, meloxicam, and

tizanidine.[10]  Id.  In an Office Note on June 2, 2017, Dr. Grossinger stated that Plaintiff

"essentially failed all conservative treatments including epidural injections, trigger point

injections, dorsal column stimulators and everything short of surgery," and referred her to

Christian Fras, M.D., a spine specialist.  Id. at 765.  Although there is no indication that

Plaintiff pursued treatment with Dr. Fras, she did continue with Grossinger Neuropain.

Dr. Grossinger noted in June 2017, that Plaintiff had continued with physical therapy and

different types of spinal injections.  Id. at 766.  He also noted that she had difficulty

sitting comfortably, had positive straight leg raising test, sitting root signs, diminished

Achilles reflexes, and a limp.  Id.  In September 2017 Dr. Grossinger prescribed

---

[9]In the administrative record, this treatment note is minimized to the point of being unreadable.  Plaintiff attached a copy of this treatment note to her brief.  Doc. 14-1 at 2.

[10]Butrans patch is a pain-relieving patch used for round-the-clock, long-term care when other pain medications have failed.  See https://www.drugs.com/cdi/butrans.html (last visited Sept. 9, 2020).  Meloxicam is a non-steroidal anti-inflammatory drug used to treat inflammation caused by rheumatoid or osteoarthritis.  See https://www.drugs.com/meloxicam.html (last visited Sept. 9, 2020).  Tizanidine is a short-acting muscle relaxer to treat spasticity.  See https://www.drugs.com/tizanidine.html (last visited Sept. 9, 2020).

methadone, tramadol, and MS Contin, and continued with spinal injections.[11]  Id. at 768-69.  The injections continued on a roughly monthly basis through April 2018.  Id. at 771 (10/20/17), 774 (12/1/17), 778 (1/5/18), 782 (2/2/18), 787 (2/23/18), 791 (3/23/18), 796 (4/23/19).  In May 2018, in the last of the treatment notes from Grossinger Neuropain, Dr. Brajer indicated that Plaintiff had tried Lyrica, but it was discontinued due to side effects, and she continued on tramadol and MS Contin, and he performed lumbar facet joint radiofrequency ablation bilaterally at L3-4, L4-5, and L5-S1.[12]  Id. at 801-02.

Plaintiff's primary care physician for much of the relevant period was Douglas Keagle, D.O., from whom she sought treatment for type 2 diabetes, hyperlipidemia, chronic pain syndrome, hypertension, and anxiety disorders for which she also saw a psychiatrist.  Tr. at 837.  In July 2017, Plaintiff also began complaining of migraines, and her medications included Janumet, ibuprofen, simvastatin, lisinopril, gabapentin,

---

[11]Methadone is an opioid medication used to treat withdrawal symptoms and as a pain reliever.  See https://www.drugs.com/methadone.html (last visited Sept. 9, 2020).  Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain.  See https://www.drugs.com/tramadol.html (last visited Sept. 9, 2020).

[12]Radiofrequency ablation is the destruction of precisely controlled areas of tissue by heat induced by low-frequency electromagnetic waves.  DIMD at 4.

famotidine, and escitalopram.[13]  Id. at 831-33.[14]  She was also later diagnosed with

GERD for which she was prescribed omeprazole.[15]  Id. at 811.[16]

Plaintiff began mental health treatment at Omni Health Services in April 2014.

Tr. at 479.  When she began treatment, Plaintiff was diagnosed with major depressive

disorder ("MDD") recurrent, and found to have a Global Assessment of Functioning

---

[13]Janumet is a diabetes medication containing metformin, which reduces glucose
production in the liver and decreasing the absorption of glucose in the intestines, and
sitagliptin, which regulates levels of insulin in the body.  See
https://www.drugs.com/janumet.html (last visited Sept. 9, 2020).  Simvastatin is a statin
used to lower blood levels of bad cholesterol (LDL), to increase levels of good
cholesterol (HDL), and lower triglycerides.  See https://www.drugs.com/simvastatin.html
(last visited Sept. 9, 2020).  Lisinopril is an ACE inhibitor used to treat high blood
pressure.  See https://www.drugs.com/lisinopril.html (last visited Sept. 9, 2020).
Famotidine reduces the amount of acid the stomach produces and is used to treat ulcers
and gastro-esophageal reflux disease ("GERD").  See
https://www.drugs.com/famotidine.html (last visited Sept. 9, 2020).  Escitalopram (brand
name Lexapro) is used to treat depression and anxiety.  See
https://www.drugs.com/cdi/escitalopram-tablets.html (last visited Sept. 9, 2020).

[14]Dr. Keagle's notes indicate that Plaintiff was being followed by Dr. Grossinger
for uncontrolled pain.

[15]Omeprazole is a proton pump inhibitor that reduces the acid produced in the
stomach, used to treat GERD.  See https://www.drugs.com/omeprazole.html (last visited
Sept. 9, 2020).

[16]The record also contains Emergency Department records from Mercy Fitzgerald
Hospital.  On January 8, 2015, Plaintiff was seen for abdominal pain and diagnosed with
constipation, treated and released.  Tr. at 312, 316.  On April 16, 2015, Plaintiff was seen
for dizziness and lightheadedness, diagnosed with dehydration, treated and released.  Id.
at 285-89.  On November 16, 2015, she was seen with a swollen right ankle.  Id. at 302.
X-rays revealed no fracture or dislocation and she was diagnosed with a sprain.  Id. at
305.  On January 31, 2017, she was seen for pain and swelling of her left foot and ankle,
after falling a week earlier.  Id. at 341.  She was diagnosed with an ankle sprain and
hyperglycemia and released.  Id. at 343.

("GAF") score of 49.[17]  Id. at 548.  She was prescribed Lexapro and Elavil.  Id. at 553.[18]

She began with weekly sessions, but switched to biweekly sessions in June 2015.  Id. at

521.  At that time, her diagnosis was MDD, recurrent, severe and she had a GAF score of

52.[19]  Id.  Although Plaintiff continued to struggle with depression, the treatment notes

indicate that she had made progress with her eating habits and her relationships with her

---

[17]The essential feature of MDD is a clinical course that is characterized by one or more major depressive episodes.  Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM 5"), at 160-61.  A major depressive episode is a period of at least two weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities.  Id. at 163.

A GAF score is a measurements of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 34.  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.  Although the DSM 5 eliminated the GAF scale, the Commissioner "will continue to receive and consider GAF in medical evidence."  Administrative Message-13066 (July 22, 2013).

[18]It appears that Plaintiff was already prescribed Lexapro and Elavil and the dosages were increased.  Tr. at 541, 553.  Elavil (generic amitriptyline) is a tricyclic antidepressant.  See https://www.drugs.com/elavil.html (last visited Sept. 9, 2020).

[19]A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM IV-TR at 34.

daughters.  Id. at 513, 519, 522.[20]  Plaintiff was discharged from treatment on February

27, 2017, based on her non-compliance with treatment.  Id. at 477-78.[21]

### D.      Consideration of Plaintiff's Claim

Plaintiff complains that the ALJ erred in concluding that her impairments did not

meet or equal Listing 1.04A and argues that the ALJ's decision provides no direct or

meaningful discussion of the elements of the Listing.  Doc. 14 at 4-9.  Defendant

responds that substantial evidence supports the ALJ's determination that Plaintiff did not

meet the requirements for Listing 1.04A and that any error is harmless.  Doc. 15 at 5-10.

Listing 1.04 applies to "Disorders of the spine (e.g., herniated nucleus pulposus,

spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet

arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda

equina) or the spinal cord."  20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04 (2018) (emphasis

added).  In the case of a herniated disc, subsection A of Listing 1.04 requires "[e]vidence

of nerve root compression characterized by neuro-anatomic distribution of pain,

limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or

muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of

the lower back, positive straight-leg raising test (sitting and supine)."  Id. § 1.04A.

---

[20]In addition to Lexapro and Elavil, Plaintiff's psychiatrist, Peter Meyer, M.D., also prescribed Plaintiff pain medications after her pain specialist ceased his practice.  Tr. at 604.  After Plaintiff began treatment with Dr. Grossinger, her primary care physician at the time, Ohenewaa Ahima, M.D., advised Dr. Meyer to wean Plaintiff from the pain medications.  Id. at 578.

[21]There are no RFC assessments or other assessments of Plaintiff's ability to perform work in the record.

In addressing Listing 1.04, the ALJ stated: "[Plaintiff's] back impairment did not meet listing 1.04 (Disorders of the spine) as there is no documentation of compromise of a nerve root or the spinal cord with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication." Tr. at 15.[22] This constitutes the entirety of the ALJ's analysis of Listing 1.04. Plaintiff argues that the August 11, 2016 MRI and July 20, 2016 EMG studies establish the disc herniation and resultant nerve root compression. Doc. 14 at 5 (citing tr. at 734, 729). Plaintiff also argues that her doctors clinically correlated her herniation to her lumbar radiculopathy. Id. (citing tr. at 731, 740). Defendant disputes Plaintiff's position that the studies suffice for purposes of Listing 1.04A. Doc. 15 at 7. Specifically, Defendant argues that the MRI did not establish nerve root compression because the herniation was "touching but not compressing the anterior aspect of the thecal sac." Id. (quoting tr. at 734). Moreover, Defendant contends "radiculopathy, in and of itself, . . . does not prove the fundamental compromise of a nerve root or spinal cord." Id.

This issue -- whether radiculopathy establishes compromise of a nerve root for purposes of Listing 1.04A -- has been the topic of some debate. The parties rely on contrasting opinions from the District of New Jersey. Defendant relies on Sampson v. Astrue, No. 09-4372, 2011 WL 1205281, at *7 (D.N.J. March 28, 2011), where Judge Debevoise affirmed the denial of benefits for a plaintiff who presented evidence of

---

[22]Spinal stenosis and arachnoiditis are relevant to subsections B and C of Listing 1.04. Because Plaintiff's argument is limited to Listing 1.04A, I will address only the ALJ's determination with respect to nerve root compression.

radiculopathy and herniation.  However, Defendant fails to note that the court made no ruling on the issue because the plaintiff did not challenge the ALJ's Listing determination, focusing instead on the ALJ's consideration of the plaintiff's pain, determination of RFC, and the jobs identified by the VE.  Id., 2011 WL 1205281, at *10-14.  In contrast, Plaintiff relies on Karstein v. Commissioner of Social Security, No. Civ. 17-4502, 2018 WL 5669172, at *7 (D.N.J. Oct. 31, 2018),[23] where Judge Kugler found that radiculopathy may suffice to establish nerve root compression for purposes of Listing 1.04A.  Although Defendant attempts to distinguish the Karstein case on the ground that the plaintiff there suffered from both cervical and lumbar related spinal issues and the case was remanded, in part, to determine the separate effects of each of these impairments, Doc. 15 at 8, Defendant overlooks that Judge Kugler stated that radiculopathy may establish nerve root compression for purposes of Listing 1.04A.

> Defendant argues that [the claimant] cannot meet the requirements of listing 1.04(A) because [the claimant] does not point to findings of "nerve root compression". . . .  But if credited, [the claimant's] radiculopathy may support that finding.  See Stockett[ v. Comm'r of Soc. Sec.], 216 F. Supp.3d 440, 456-55 [(D.N.J. 2016)] ("As for nerve root compression, the Plaintiff notes that she has been repeatedly diagnosed with radiculopathy, which is evidence of nerve root compression."); Killen v. Stryker Spine, No. 11-cv-1508, 2012 WL 4482371, at *1 n.4 (W.D. Pa. Aug. 21, 2012) ("Radiculopathy is the medical term for pain and other symptoms resulting from a compressed nerve root."); Caraballo v. Astrue, No. 11-cv-00112, 2012 WL 983579, at *8 n.27 (M.D. Pa. March 22, 2012) ("Radiculopathy is a condition due to a compressed nerve in the spine that can

---

[23]Plaintiff gives the pinpoint cite at *15.  Doc. 14 at 5.  This is incorrect.  The Westlaw version of the case contains only ten pages, and the proposition for which Plaintiff relies on the case appears at *7.

> cause pain[,] numbness tingling, or weakness along the
> course of the nerve."); Wojciechowski v. Barnhart, No. 02-
> cv-263, 2004 WL 878468, at *2 n.2 (D. Del. Apr. 21, 2004)
> ("Radiculopathy is a disease of the spine in which there is a
> compression of the nerve roots . . . .").

Karstein, 2018 WL 5669172, at *7.  Thus, there seems to be a valid argument that the

evidence in this case establishes that Plaintiff suffers from a disorder of the spine

resulting in compromise of a nerve root -- an argument that requires more than a

conclusory sentence restating the requirements of the Listing without any discussion of

the evidence.

The Third Circuit requires the ALJ to "set forth the reasons for [her] decision."

Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).  In Jones v.

Barnhart, the Third Circuit stated that "the function of Burnett is to ensure that there is

sufficient development of the record and explanation of findings to permit meaningful

review."  364 F.3d 501, 505 (3d Cir. 2004) (citing Burnett, 220 F.3d at 120).  In Karstein,

Judge Kugler applied Burnett in remanding the case, finding that "repeat[ing] the

requirements of the listing . . . and conclud[ing] that no medical evidence met the

requirements, without discussing Plaintiff's medical evidence" was insufficient analysis.

2018 WL 5669171, at *6.  Several other courts in our circuit have similarly remanded

cases for further consideration of Listing 1.04 where the ALJ conducted no review or

only a cursory review of the medical record in addressing the Listing.  See DeJohn v.

Comm'r of Soc. Sec., Civ. No. 18-15346, 2020 WL 1486042, at *9 (D.N.J. March 27,

2020) (McNulty, J.); Schneider v. Saul, Civ. No. 18-193, 2020 WL 774036, at *4 (M.D.

Pa. Feb. 18, 2020) (Mannion, J.); Ashe v. Berryhill, Civ. No. 16-956, 2019 WL 1430243,

at *8 (D. Del. March 29, 2019) (Noreika, J.); Swanson v. Comm'r of Soc. Sec., Civ. No.

15-8894, 2017 WL 825199, at *7 (D.N.J. March 2, 2017) (Hillman, J.); Stockett, 216 F.

Supp.3d at 456; Tursky v. Colvin, Civ. No. 14-3241, 2015 WL 4064707, at *17-19

(D.N.J. July 2, 2015) (Wolfson, J.); Istrefi v. Comm'r of Soc. Sec., Civ. No. 13-3095,

2014 WL 4269132, at *8 (D.N.J. Aug. 29, 2014) (Wigenton, J.).  Here, as previously

noted, the ALJ's discussion of Listing 1.04 was limited to a single conclusory sentence.

Defendant asks this court to look beyond the ALJ's Listing discussion and

consider the opinion as a whole in analyzing the ALJ's discussion at step three.   Doc. 15

at 10-11.  "Burnett does not require the ALJ to use particular language or adhere to a

particular format in conducting his analysis," but, as noted, "the function of Burnett is to

ensure that there is sufficient development of the record and explanation of findings to

permit meaningful review."  Jones, 364 F.3d at 505.  Jones requires the court to look at

the ALJ's opinion as a whole.  Id.

Even read as a whole, the ALJ's decision does not provide an adequate

explanation for her Listing determination.  For example, the ALJ states that the medical

record indicates "minimal positive findings including some muscle spasms in the low

back with tenderness in the lumbar spine and facet, antalgic and limping gait, and intact

sensation and reflexes."  Tr. at 20 (citing id. at 390-476).  The ALJ failed to address the

limitation of motion of the spine, muscle weakness, and diminished reflexes noted by the

doctors at Grossinger Neuropain, see id. at 744 (11/7/16 – restriction in lumbar flexion),

353 (6/2/17 – weakness in legs particularly hamstrings); 357 (5/5/17 – paraspinous

muscles weak and weakness in legs); 766 (6/19/17 - diminished Achilles reflexes and

weakness in the hip flexors, quadriceps, dorsiflexors, and invertors),[24] the multiple

positive left straight leg-raising tests and Patrick tests throughout Plaintiff's treatment at

GPSP and Grossinger Neuropain, id. at 397 (8/8/13), 400 (9/6/13), 403 (9/27/13), 406

(11/8/13), 409 (2/7/14), 410 (2/11/14), 413 (3/7/14), 415 (4/1/14), 417 (5/2/14), 420

(6/10/14), 423 (7/7/14), 425 (8/6/14), 427 (8/26/14), 430 (10/7/14), 433 (11/7/14), 436

(12/5/14), 439 (1/5/15), 441 (2/3/15), 445 (3/31/15), 448 (5/12/15), 451 (7/2/15), 453

(8/3/15), 457 (9/4/15), 460 (9/29/15), 463 (10/30/15),[25] 744 (11/7/16), and failed to

explain if or how she considered Plaintiff's radiculopathy in considering the requirements

of Listing 1.04A.

 Defendant also argues that any error in the determination of the existence of nerve

root compression is harmless because Plaintiff has failed to establish the other

requirements of Listing 1.04A:  limitation of motion of the spine or motor loss, sensory

or reflex loss, or a positive straight leg-raising test in both the seated and supine

positions.  Doc. 15 at 8-10.  I reject Defendant's harmless error argument for two reasons.

First, this court is constrained to review only the ALJ's reasoning, not the post hoc

arguments propounded by Defendant after the ALJ's decision.  See Fargnoli v.

Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (quoting SEC v. Chenery Corp., 318 U.S.

80 (1943) ("The grounds upon which an administrative order must be judged are those

---

 [24]I note that the latter notes evidencing weakness post-date Plaintiff's insured
status.  However, the ALJ never considered any of the evidence of weakness or limitation
of motion in considering Listing 1.04A.

 [25]The notes from GPSP pre-dating Plaintiff's alleged onset date also note positive
straight leg raising tests.  See tr. at 391 (5/16/13), 394 (7/11/13).

upon which the record discloses that its action was based.")).  Here, the ALJ's discussion of Listing 1.04A was limited to a finding that "there is no documentation of compromise of a nerve root or the spinal cord with evidence of nerve root compression."  Tr. at 15. She did not address the other requirements of Listing 1.04A.  Second, contrary to Defendant's argument, and as summarized in the preceding paragraph, the doctors at Grossinger Neuropain found Plaintiff had limitation in the motion of her spine and weakness in her legs and spine and Dr. Grossinger specifically noted diminished Achilles tendon reflexes.

Furthermore, Defendant's argument that Plaintiff has failed to produce evidence of positive straight leg-raising tests in both the sitting and supine positions is disingenuous. As already noted, Plaintiff had positive straight leg-raising tests on the left throughout her treatment at GPSP and Grossinger Neuropain.  If there were a question about the form of the tests, the ALJ could have recontacted the doctors for clarification.

Defendant also argues that all Listings under 1.00, including 1.04A, require evidence of an inability to ambulate effectively or perform fine or gross movements effectively, neither of which Plaintiff has shown.  Doc. 15 at 9.  Fargnoli and Chenery forestall this court's reliance on this argument because it was not the basis of the ALJ's decision.  Moreover, Defendant's interpretation runs contrary to statutory construction. The inability to ambulate effectively is included in some, but not all, of the musculoskeletal Listings.  There would be no need to specifically include this limitation if it applied to all of the musculoskeletal Listings.

Listing 1.00, "Musculoskeletal System," defines "What We Mean by Inability to Ambulate Effectively."  20 C.F.R. Pt. 404 Subpt. P App. 1 §1.00B2b.  Rather than applying to each and every musculoskeletal listing, the definition is applicable to those subsections that require an inability to ambulate effectively.  For example, Listing 1.02, "Major dysfunction of a joint(s)," requires, with respect to a weight-bearing joint, an inability to ambulate effectively.  Id. § 1.02A.  Specifically looking at Listing 1.04, a claimant must establish a disorder of the spine resulting in compromise of a nerve root or the spinal cord.  20 C.F.R. Pt. 404, Subpt. P, App. 1 §1.04.  From that point the Listing is written disjunctively and the claimant must meet either subsection A, B, or C.  In order to meet subsection A, there must be "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."  Id. §1.04A.  Subsection A does not by its terms require evidence of an inability to ambulate effectively, whereas Subsection C does.  In addition to establishing a disorder of the spine resulting in compromise of a nerve root or the spinal cord, subsection C requires "[l]umbar spinal stenosis, resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00B2b."  Id. § 1.04C.

Defendant relies on an unpublished Third Circuit opinion to argue that Listing 1.04A includes a requirement that the claimant cannot ambulate effectively or perform fine and gross movements effectively.  Doc. 15 at 9 (citing Leibig v. Barnhart, 243 F.

App'x 699, 702 (3d. Cir. 2007)).  However, my research reveals that the Third Circuit has not published an opinion determining whether the ability to ambulate effectively or perform fine and gross movement effectively is a requirement for all of the Musculoskeletal Listings, and that its unpublished decisions are split.  Compare Johnson v. Comm'r of Soc. Sec., 263 F. App'x 199, 202 (3d Cir. 2008) (addressing section 1.04 in the disjunctive and finding only subsection C requires an inability to ambulate effectively); McDaniels v. Comm'r of Soc. Sec., 136 F. App'x 485, 487 (3d Cir. 2005) (addressing 1.04 disjunctively), with Garrett v. Comm'r of Soc. Sec., 274 F. App'x 159, 162-63 (3d Cir. 2008) (noting that section 1.00B2b is applicable to all Listings under section 1.00.); Leibig, 243 F. Appx. at 702.  Thus, there is no controlling precedent, and I will be guided by the disjunctive language of Listing 1.04.  Accordingly, I reject Defendant's harmless error argument.

## IV.   <u>CONCLUSION</u>

The ALJ's determination that Plaintiff did not meet Listing 1.04A is insufficient to allow meaningful judicial review.  The ALJ failed to explain how she considered Plaintiff's radiculopathy in the Listing analysis and failed to address evidence relevant to the Listing's requirements.  I express no view on whether the medical evidence in the record is sufficient to meet or equal Listing 1.04A.  However, the ALJ must explain her reasoning consistent with Burnett, 220 F.3d at 119.

An appropriate Order follows.